UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CATRINA M. T. [1],

      Plaintiff,

         v.                   CASE NO. 2:21-CV-21-MGG

COMMISSIONER OF SOCIAL
  SECURITY,

      Defendant.

## OPINION and ORDER

Plaintiff Catrina M. T. ("Ms. T") seeks judicial review of the Social Security

Commissioner's decision denying Ms. T's application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the

Social Security Act (the "Act"). This Court may enter a ruling in this matter based on

the parties' consent pursuant to 28 U.S.C. § 636(c)(1)  and 42 U.S.C. § 405(g). [*See* DE 8].

For the reasons discussed below, the Court **REMANDS** the Commissioner's decision.

## I.   OVERVIEW OF THE CASE

Ms. T protectively filed applications for DIB and SSI on July 9, 2018, alleging a

disability onset date of July 23, 2017.  Ms. T's applications were denied initially on

October 23, 2018, and upon reconsideration on May 6, 2019. Following a hearing on

February 27, 2020, an Administrative Law Judge ("ALJ") issued a decision on March 31,

2020, which affirmed the Social Security Administration's ("SSA's") denial of benefits.

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the
Court refers to the plaintiff by first name and last initial only.

The ALJ's decision became the final decision of the Commissioner when the SSA

Appeals Council declined review on November 20, 2020. *See Fast v. Barnhart*, 397 F.3d

468, 470 (7th Cir. 2005).

Ms. T timely sought judicial review of the Commissioner's decision on January

19, 2021. Ms. T filed her opening brief on November 11, 2021, and the Commissioner

filed her Memorandum in Support of Decision on February 22, 2022. This matter

became ripe on April 6, 2022, when Ms. T filed her reply.

## II.   APPLICABLE STANDARDS

### A.   Disability Standard

To qualify for DIB, a claimant must be "disabled" as defined under the Act. A

person is disabled under the Act if "he or she has an inability to engage in any

substantial gainful activity by reason of a medically determinable physical or mental

impairment which can be expected to last for a continuous period of not less than

twelve months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity ("SGA") is defined

as work activity that involves significant physical or mental activities done for pay or

profit. 20 C.F.R. § 404.1572.

The Commissioner's five-step sequential inquiry in evaluating claims for DIB

and SSI under the Act includes determinations as to: (1) whether the claimant is

engaged in SGA; (2) whether the claimant's impairments are severe; (3) whether any of

the claimant's impairments, alone or in combination, meet or equal one of the Listings

in Appendix 1 to Subpart P of Part 404; (4) whether the claimant can perform her past

relevant work based upon her residual functional capacity ("RFC"); and, if not, (5)

whether the claimant is capable of performing other work. 20 C.F.R. §§ 404.1520; 416.920[2]. The claimant bears the burden of proof at every step except Step Five, where the burden shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000).

### B.    Standard of Review

This Court has authority to review a disability decision by the Commissioner pursuant to 42 U.S.C. § 405(g). However, this Court's role in reviewing social security cases is limited. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The question on judicial review is not whether the claimant is disabled; rather, the Court considers whether the ALJ used "the correct legal standards and [whether] the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2007).

The Court must uphold the ALJ's decision so long as it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). Substantial evidence is "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence has also been understood as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). The Supreme Court has also noted that "substantial evidence" is a term of art in administrative law, and that "whatever the meaning of 'substantial' in other contexts,

---

[2] Regulations governing applications for DIB and SSI are almost identical and are found at 20 C.F.R. § 404 and 20 C.F.R. § 416 respectively. Going forward, this Opinion and Order will only refer to 20 C.F.R. § 404 unless explicit distinction between the DIB and SSI regulations is necessary.

the threshold for such evidentiary sufficiency is not high" in social security appeals. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The Court reviews the entire administrative record to determine whether substantial evidence exists, but it may not reconsider facts, reweigh the evidence, resolve conflicts of evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Accordingly, at a minimum, the ALJ must articulate his analysis of the record to allow the reviewing court to trace the path of his reasoning and to be assured the ALJ has considered the important evidence in the record. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not required to address every piece of evidence in the record so long as he provides a glimpse into the reasoning behind his analysis to build the requisite "logical bridge" from the evidence to his conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

On the other hand, an ALJ's decision cannot stand if it lacks evidentiary support or inadequately discusses the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "The ALJ must confront the evidence that does not support his conclusion and support why that evidence was rejected." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). An ALJ's decision will lack sufficient evidentiary support and require remand if the ALJ "cherry-picked" the record to support a finding of non-disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Wilson v. Colvin*, 48 F. Supp. 3d 1140, 1147 (N.D. Ill. 2014). Likewise, deference for the ALJ's decision is lessened where the ALJ's findings contain errors of fact or logic or fail to apply the correct legal standard. *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013). If the ALJ's decision is not supported by

substantial evidence, remand is typically appropriate. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id.* (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

III.   ANALYSIS

A.   **The ALJ's Decision**

Ms. T's hearing before an ALJ on her applications for DIB and SSI took place on February 27, 2020. On March 31, 2020, the ALJ issued his written decision finding that Ms. T was not disabled, conducting the requisite five-step analysis for evaluating claims for disability benefits. 20 C.F.R. §404.1520.

At Step One, an ALJ's inquiry focuses on whether a claimant is engaging in substantial gainful activity. Here, the ALJ determined that Ms. T had not engaged in substantial gainful activity since her alleged onset date of July 23, 2017.

At Step Two, an ALJ's inquiry focuses on whether a claimant's impairments are severe. For an impairment to be considered severe, an impairment or combination of impairments must significantly limit the claimant's ability to perform basic work-related activities. 20 C.F.R. § 404.1521. Here, the ALJ found that Ms. T suffers from the severe impairments of major joint dysfunction of the ankles, obesity, migraines, asthma, anxiety, depression, bipolar disorder, and post-traumatic stress order. Conversely, an impairment is considered non-severe when the medical evidence establishes only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to perform basic work functions. *See, e.g.,* 20

5

C.F.R. § 404.1522; S.S.R. 85-28, 1985 WL 56856 (Jan. 1, 1985). Here, the ALJ found that Ms. T had the following non-severe medically determinable impairments: hypertension and osteoporosis.

At Step Three, the ALJ found that none of Ms. T's severe impairments, nor any combination of her impairments, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Here, the ALJ considered listings 1.02, 1.03, 3.03, 11.02, 12.04, 12.06, 12.15, and SSR 12-2p. Accordingly, before moving on to Step Four, the ALJ proceeded to determine whether Ms. T can perform her past relevant work based upon her residual functional capacity ("RFC").

A claimant's RFC includes limitations for all medically determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). The RFC is the most that an individual can do despite her limitations. 20 C.F.R. § 404.1545(a). To determine a claimant's RFC, the ALJ must consider the claimant's symptoms, their intensity, persistence, and limiting effects, and the consistency of these symptoms with the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1545(a)(1). Physical exertion levels in an RFC are classified as either sedentary, light, medium, heavy, or very heavy. 20 C.F.R. § 404.1567. Here, the ALJ found that Ms. T has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) with the following additional limitations:

> except that she can occasionally climb ramps and stairs, as well as occasionally balance, stoop, kneel, crouch, and crawl; and she can occasionally work in dust, odors, fumes, and pulmonary irritants. She can never climb ladders, ropes, or scaffolds, never work at unprotected heights, never around dangerous machinery with moving mechanical parts, and never operate a motor vehicle as part of her work-related duties. She can never work in bright sunlight or bright, flickering lights,

6

> such as would be experienced in welding or cutting metals, and she is limited to working environments that have no more than a moderate noise level. She is limited to simple work-related decisions and simple, routine tasks with no assembly line work or strictly enforced daily production quotas. She can occasionally interact with the general public, co-workers, and supervisor.

[DE 14 at 25; AR 21]. Based on this RFC, at Step Four, the ALJ found that Ms. T was unable to perform her past relevant work as a hair stylist. Accordingly, the ALJ moved on to the last step in the five-step sequential analysis.

At Step Five, while the burden of proof shifts to the Commissioner, the Commissioner need only show that the claimant can perform some type of substantial gainful work existing in the national economy in significant numbers. 42 U.S.C. § 423(d)(2)(A). ALJs typically enlist a vocational expert ("VE") to testify regarding which occupations, if any, a claimant can perform. *See* S.S.R. 83-12. VEs use information from the Dictionary of Occupational Titles ("DOT") to inform their assessments of a claimant's ability to perform certain types of work. S.S.R. 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). Here, the VE, using the DOT, identified three separate jobs that Ms. T could still perform with her RFC—assembler, packer/bandoleer straightener stamper, and inspector—which, respectively, have over 25,000 jobs nationally, 5,600 jobs nationally, and 12,000 jobs nationally (42,600 jobs total).

Finding that Ms. T could make an adjustment to other work that existed in significant numbers, the ALJ determined that Ms. T was not under a disability, as defined in the Act, from her alleged onset date through the date of ALJ's decision on March 31, 2020.

B.    **Issues for Review**

Ms. T raises two overarching challenges to the ALJ's decision: that the ALJ erred in his evaluation of Listings 1.02 and 1.03 at Step Three and that the ALJ erred in his determination of Ms. T's RFC regarding her mental limitations and need for an assistive device. As explained below, the Court's analysis focuses primarily on the ALJ's discussion of Ms. T's RFC. Ms. T's challenges to her RFC reveal a pattern of analysis by the ALJ that is not supported by substantial evidence such that remand is required.

C.    **Discussion**

1.    **The ALJ's Listings Analysis**

Ms. T first challenges the ALJ's discussion of Listings 1.02 and 1.03 at Step Three. Ms. T contends that the ALJ's analysis is insufficient because the ALJ failed to provide the requisite logical bridge between the evidence and his conclusion that Ms. T's ankle impairment does not meet Listings 1.02 and 1.03. Ms. T maintains that the ALJ merely recited the text of the listings and cited to various exhibits without any explanation as to how these records showed that Ms. T does not meet the Listings.

"The Listings describe impairments that are considered so severe as to be per se disabling." *Zellweger v. Saul*, 984 F.3d 1251, 1252 (7th Cir. 2021). To meet or medically equal one of the impairments in the Listings, a claimant must satisfy all criteria in a Listing for at least twelve months. 20 C.F.R. § 416.925(c)(4); *see also Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). A claimant bears the burden of showing that she has met all requirements of a Listing. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). However, ALJs must support a finding that a claimant does not meet a Listing with

8

"more than a perfunctory analysis." *Jeske v. Saul*, 955 F.3d 583, 588–90 (7th Cir. 2020) (citation omitted). Such analysis need not be fully articulated at Step Three. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("There is no requirement of . . . tidy packaging . . . [the Court] read[s] the ALJ's decision as a whole and with common sense.") (citations omitted). Accordingly, an ALJ may "provide[] further support for [his] Step Three finding in the RFC analysis." *Zellweger*, 984 F.3d at 1255; *see also Jeske*, 955 F.3d at 590 ("[W]hen an ALJ explains how the evidence reveals a claimant's functional capacity, that discussion may doubly explain how the evidence shows the claimant's impairment is not presumptively disabling under the pertinent listing.")

In her opening brief, Ms. T challenges the ALJ's findings as to Listing 1.02[3] (major dysfunction of a joint) and Listing 1.03[4] (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint). Both Listings require that a claimant show an "inability to ambulate, as defined in 1.00B2b."

1.00B2b states

b. What We Mean by Inability To Ambulate Effectively

---

[3] Listing 1.02 describes an impairment

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b....
> 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02.

[4] Listing 1.03 describes "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.03.

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.
[...]

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00(B)(2)(b).

Here, the ALJ's analysis of these listings at Step Three first states that he "cannot find evidence that [Ms. T's impairments] meet or medically equal the severity of any of the listings." [DE 14 at 22; AR 18]. As to Listing 1.02, the ALJ then stated that

> The claimant's major joint dysfunction of the bilateral ankles do not meet or medically equal listing 1.02. The record, consistent with the findings below, does not demonstrate gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints resulting in inability to ambulate effectively or involving of one major peripheral weight-bearing joint result in an inability to ambulate effectively. (2F/108; 3F/12-14; 4F/8; 10F/17; 8F/4, 15.)

*Id.* Next, regarding Listing 1.03, the ALJ observed that Ms. T's "multiple ankle surgeries do not meet or medically equal listing 1.03. As discussed below, the objective evidence

does not demonstrate that the claimant had an inability to ambulate effectively and to return to effective ambulation did occur, or is not expected to occur, within 12 months of onset. (4F/8)."

Indeed, the ALJ's analysis within Step Three does no more than recount the text of the Listings and cite to exhibits without further explanation. However, the Court must evaluate the decision "as a whole and with common sense." *Buckhanon ex rel. J.H., 368 F. App'x at 678-79*. The Court accordingly considers whether the ALJ's discussion of the evidence for Ms. T's RFC "doubly explains" how Ms. T's ankle impairment does not meet Listings 1.02 and 1.03. *Jeske, 955 F.3d at 590*.

### 2.  The ALJ's Determination of Ms. T's RFC

Like her challenge to the ALJ's analysis of Listings 1.02 and 1.03, Ms. T disputes the ALJ's discussion of her ability to ambulate in her RFC. Ms. T contends that the ALJ cherry-picked evidence to support his conclusions about Ms. T's ability to ambulate, and accordingly, her RFC fails to account for an assistive device and the full extent of her mobility limitations. Next, Ms. T also contends that the ALJ cherry-picked evidence regarding her mental impairments such that her RFC does not account for the full extent of her mental impairments.

The Commissioner raises numerous arguments in response. First, the Commissioner contends that the ALJ repeatedly discussed evidence of Ms. T's ability to ambulate and that Ms. T's arguments on review merely disagree with the ALJ's interpretation of this evidence. The Commissioner also contends that Ms. T has failed to

show that the ALJ was prejudicially biased.[5] Ultimately, the Commissioner contends

that Ms. T's RFC is supported by substantial evidence because the ALJ explained that he

was persuaded by the state agency consultants and that Ms. T has failed to provide any

opinion showing the need for further limitations.

### a.   Ms. T's Ability to Ambulate

The ALJ began his discussion of Ms. T's RFC by acknowledging Ms. T's

allegations of her disabling symptoms and limitations. Relevant to Ms. T's challenges

on review, the ALJ observed that Ms. T testified that she needed to use an assistive

device to ambulate; that she had a limited range of motion, stiffness, and weakness in

her ankle; that she had fallen numerous times; and that her pain was constant. The ALJ

further acknowledged that Ms. T reported that she can stand for about 2-5 minutes with

her crutches but that she can only stand for about one minute without her crutches. Her

symptoms are aggravated by prolonged standing, sitting, and walking, and lifting.

After acknowledging Ms. T's allegations, the ALJ concluded that Ms. T's "statements

concerning the intensity, persistence, and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record for the

reasons explain in this decision." [DE 14 at 25-26; AR 21-22].

The ALJ then summarized medical evidence from the record revealing the

sequence of Ms. T's medical care from July 2017 to January 2020. The decision begins

---

[5] As discussed throughout this opinion, Ms. T has not argued that remand is required because the ALJ was biased. Rather, Ms. T's arguments contend that the ALJ relied only on evidence that supported his conclusions leading to the RFC and that the ALJ failed to address evidence contrary to these conclusions. Accordingly, the Commissioner's bias arguments are misplaced and will not be further addressed in this opinion.

with an overview of evidence revealing abnormal findings or other limitations before summarizing evidence showing normal findings. The Court recounts relevant portions here. The ALJ first discussed that Ms. T was involved in a motor vehicle accident in July 2017[6], causing injury to both of her ankles. The ALJ noted that imaging from the emergency department revealed that Ms. T had "post-traumatic arthrotomy in the left ankle and a right close pilon fracture in the right ankle, as well as laxity, crepitus, and tenderness in the right ankle." [DE 14 at 26; AR 22, citing to Exhibits 2F/9, 20, 30-31]. Ms. T had surgery on both ankles shortly after this accident, followed by a subsequent surgery on her right ankle in August 2017. [*Id.* citing Exhibit 2F]. The ALJ acknowledged that treatment records after these surgeries revealed abnormal active range of motion in her left ankle and decreased sensation in her right ankle.

Next, the ALJ noted that Ms. T participated in outpatient physical therapy, observing that records revealed that she was "non-weight bearing bilaterally, and [she] wore a soft cast on her lower extremity and a boot on the left." [DE 14 at 26; AR 22, citing Exhibit 3F/4, 6]. The ALJ noted that physical therapy providers observed that Ms. T arrived at appointments in a wheelchair in August 2017 and December 2017. The ALJ also discussed imaging from November 2017, which showed post-surgical changes in her right distal tibia. The ALJ also noted that imaging of Ms. T's right ankle from May 2018 showed worsening bone fragmentation of the lower right tibia.

---

[6] Ms. T's alleged onset date coincides with the date of this motor vehicle accident.

The ALJ also summarized portions of Ms. T's consultative examination with Dr. Siddiqui, which occurred in October 2018. The ALJ noted that Dr. Siddiqui found Ms. T to be in "mild distress upon walking and getting on and off the examination table, as well as limping favoring her right leg when walking." [DE 14 at 27; AR 23, citing Exhibit 5F/2]. The ALJ also summarized Dr. Siddiqui's findings of tenderness, swelling, and limited range of motion in both of Ms. T's ankles and her right knee. Finally, the ALJ observed that additional records from that month showed that Ms. T went to the emergency room for ankle pain and that she had a mild edema.

Ms. T went back to the emergency room in February 2019 after she reported falling down the stairs. Emergency room records provide that Ms. T had a limited range of motion and swelling in her right ankle and that she was given crutches to ambulate. In August 2019, Ms. T had ankle pain, and imaging revealed that Ms. T had two broken pins in her right ankle. Ms. T had surgery to remove the broken pins in October 2019 and participated in physical therapy again. Physical therapy records from December 2019 noted that Ms. T had "difficulty with weight shifting over the right lower extremity with all walking due to pain and weakness, as well as limited range of motion." [DE 14 at 27; AR 23, citing Exhibit 12F/3]. Ms. T again reported slipping down the stairs. Finally, the ALJ referenced records from January 2020 that showed Ms. T with a decreased range of motion and tenderness in both ankles, bilateral ankle weakness, and abnormal gait.

After this summary, the ALJ proceeded to recount evidence showing more normal findings from the record. The ALJ first referenced records following Ms. T's first

few surgeries finding that she was doing well overall. The ALJ also referenced physical therapy records from September 2017 through November 2017 stating that Ms. T reported improvements in stretching, passive range of motion, pain levels, and ability to maintain flat foot contact. [*Id.* at 28; AR 24, citation to 3F/12-14, 25, 27, 39]. The ALJ also cited records from Ms. T's nurse practitioner noting that that she had a normal musculoskeletal range of motion during office visits on April 26, 2018, and July 18, 2018. [*Id.,* citation to 8F/4, 15]. The ALJ also observed that imaging from May 2018 showed that her distal tibular fracture was well-healed despite bone fragmentation at the tibial plafond. [*Id.* citing 3F/61]. The ALJ also discussed Ms. T's consultative examination with Dr. Siddiqui again, noting that Dr. Siddiqui also observed that Ms. T was able to walk without the support of an assistive during the exam and that she was able to get on and off the exam table without difficulty.

The ALJ also referred to orthopedic treatment records from November 2019 noting that Ms. T had full range of motion in her right ankle despite some discomfort. The ALJ also cited to records from this provider in November 2018 finding that Ms. T had no swelling in right and left lower extremities as well as a normal range of motion in her hips and ankles. [*Id.* citation to 10F/2, 17]. The ALJ also cited May 2019 emergency room treatment records, which noted Ms. T had normal strength in the neurological section of the physical examination. [*Id.* at 29; AR 25, citation to Exhibit 12F/142]. As to Ms. T's ability to ambulate independently, the ALJ referenced an orthopedic treatment record from April 25, 2018. [*Id.* at 30; AR 26, citation to Exhibit 4F/8]. In this record, it states that Ms. T reported "she is currently full weight bearing at

this time" and that she "denies any inability to move her bilateral lower extremities." [DE 14 at 630; AR 626].

After summarizing evidence showing both abnormalities and more normal findings, the ALJ concluded as follows: "[w]hile the records note that [Ms. T] at times has experienced pain with motion and has an antalgic gait, upon examination, [Ms. T] has generally been described as having normal range of motion, normal strength, and intact sensation." [DE 14 at 29; AR 25, citing Exhibits 8F/4, 15; 10F/2, 17; 12F/142]. The ALJ then stated that, even with her multiple surgeries, abnormal gait, and BMI, because Ms. T had improvement with physical therapy, could ambulate independently, had normal range of motion and strength, she could complete work at the sedentary level with certain additional limitations. [*Id.*, citing Exhibits 3F/12-14, 25, 27, 39; 8F/4, 15; 10F/2, 17]. The ALJ supported these conclusions with string citations to some of the positive or normal findings previously cited or summarized in the opinion.

As stated, Ms. T contends that the ALJ cherry-picked the evidence cited to support these conclusions and failed to reconcile this evidence with other evidence of abnormalities discussed in the decision. Ms. T further contends that the ALJ largely ignored other evidence in the record showing abnormalities or limitations.  In response, the Commissioner contends that the ALJ repeatedly discussed Ms. T's ability to ambulate in the decision and that Ms. T merely disagrees with the ALJ's discussion of this evidence.

As recounted by the Court, it is true that the ALJ discussed evidence about Ms. T's ability to ambulate. However, "summarizing the evidence is not a substitute for

analysis." *John L. v. Saul*, No. 4:19CV18, 2020 WL 401887, at *12 (N.D. Ind. Jan. 23, 2020) (internal citations omitted); *Smith v. Astrue*, No. 09 C 6210, 2011 WL 722539, at *12 (N.D. Ill. Feb. 22, 2011) (stating "cataloguing [evidence from the record] is no substitute for analysis or explanation"). Notably, by merely citing and summarizing evidence before stating his conclusions, the ALJ failed to adequately explain what role evidence of abnormalities played in his conclusion regarding Ms. T's RFC. Without any explanation for his reasoning finding the normal findings more determinative for Ms. T's RFC, the Court is unable to be sure that the ALJ considered the important evidence in the record.

For instance, despite summarizing records showing weakness and decreased range of motion in Ms. T's ankles in August 2017, October 2018, February 2019, December 2019, and January 2020 (*See* DE 14 at 26-27, citations to Exhibits 11F/2, 12F/3, 5F/3, 2F/108, 3F/5-6, 29-30), the ALJ ultimately concluded that Ms. T "generally has been described" as having normal range of motion and strength, citing to other records of positive findings. He fails to reconcile these normal findings with records previously discussed. Likewise, although ALJ explains that the record does not support a cane because "following surgeries [Ms. T] was able to ambulate independently" and that she had "some improvement with physical therapy" the ALJ fails to reconcile this with his prior reference to records showing that Ms. T reported falls in February 2019 and December 2019 or with records showing continued limitations in her range of motion. This failure to reconcile evidence is more poignant considering the ALJ's treatment of Dr. Siddiqui's consultative examination. The ALJ noted Dr. Siddiqui's more "positive" finding that Ms. T was able to walk without any assistive device during the exam, but

he fails to weigh or reconcile this finding with his previous notation that Dr. Siddiqui also found Ms. T to be in mild distress and limping while walking.

The ALJ's decision also appears to rely on isolated treatment notes with normal findings without acknowledging similar records demonstrating abnormalities or limitations. As such, the ALJ fails to explain why these treatment notes were more determinative for Ms. T's RFC. For instance, while the ALJ relied upon certain orthopedic treatment records from November 2019 showing that Ms. T retained a normal range of motion despite discomfort, Ms. T points to other records from October 2019 through December 2019—which were not discussed by the ALJ—that note a decreased range of motion or bilateral foot or ankle weakness, or edema, tenderness, and deformity. [*See* Exhibit 11F at 2, 6, 12, 18]. Likewise, while the ALJ refers to a treatment record from April 25, 2018, to support that Ms. T could ambulate independently, a record from this same provider from May 5, 2018, demonstrates that Ms. T "continues with 50% range of motion of the tibiotalar joint" and "25% range of motion in the subtalar joint" and she was "instructed at this point to starting using her ankle brace for support." [DE 14 at 628-29; AR 624-25].

Further review of the records cited by the ALJ in support of his conclusions of more normal findings for Ms. T's RFC reveal additional cherry-picking. For instance, the ALJ relies on Ms. T's emergency room records from May 9, 2019, to support his conclusion that she was generally observed to have normal strength [*See* DE 14 at 29; AR 25, citation to 12F/142.] However, the ALJ fails to acknowledge or address that physical examination notes from this same visit also note that Ms. T exhibited a

decreased range of motion and swelling in her right ankle, that she was positive for arthralgias in her right ankle, that she had a gait problem due to her right ankle pain, and that she had joint swelling in her right ankle. [*See* DE 14 at 1038; AR 1034, Exhibit 12F/141]. Likewise, the ALJ cites to an orthopedic treatment record from April 25, 2018, to state that the record shows Ms. T was able to ambulate independently. In citing this record, the ALJ fails to observe that it also states that Ms. T had a reduced range of motion in her ankles and that Ms. T had been given an orthopedic boot.

The ALJ's cherry-picking of normal findings in the decision also reveals errors of fact or logic such that the Court's deference to the decision is lessened. *Schomas*, 732 F.3d at 709. For instance, as part of the ALJ's summary of normal findings from Dr. Siddiqui's consultative exam, the ALJ stated that Dr. Siddiqui observed that "[Ms. T] was able to get on and off the examining table without difficulty." [DE 14 at 28; AR 24]. However, review of Dr. Siddiqui's consultative examination record reveals that Dr. Siddiqui actually observed that "She is able to get on and off the examining table **with** difficulty." [DE 14 at 683; AR 679 (emphasis added)]. Moreover, the ALJ discounted Ms. T's testimony for certain limitations with narrow citations to positive findings that also appear to be on "shaky grounds." *Id.* For instance, the ALJ summarized a January 2018 treatment record that Ms. T was able to step with crutches with minimal difficulty over her left ankle as part of his larger discussion of normal findings in the record. However, despite noting this as part of the ALJ's recitation of more positive findings in the record, the ALJ later found Ms. T's testimony that she had been "using crutches since 2018" inconsistent with the record because she was given crutches in the emergency room in

February 2019. Moreover, later in the decision, the ALJ found that Ms. T was capable of "greater abilities than [she] alleged" in part because she reported to a provider in December 2019 that she had been running errands in a car all day and standing for prolonged periods. [DE 14 at 28; AR 24]. The ALJ also found this report to her providers inconsistent with Ms. T's hearing testimony that she had difficulty standing and walking. While the ALJ correctly noted that Ms. T made this report to her providers, the ALJ fails to acknowledge that Ms. T also reported that her prolonged standing caused her 7/10 pain and difficulty walking. Likewise, the ALJ fails to note that Ms. T reported that her day spent running errands and driving her car similarly caused her 7/10 pain. Considering the full context of Ms. T's statements to her providers, the Court is unable to trace the ALJ's reasoning as to how these statements are inconsistent with Ms. T's allegations of her disabling symptom and limitations. This error is particularly cogent considering that Ms. T also testified that prolonged sitting or standing aggravates her ankle pain.

In sum, the ALJ's decision fails to provide an accurate and logical bridge between the evidence discussed and the ALJ's conclusions that Ms. T was "generally has been described as having normal range of motion, normal strength, and intact sensation" or that she could ambulate independently such that she is capable of performing work in accordance with the RFC prescribed. In addition, the ALJ's conclusions rest on selected positive evidence without explanation as to why these findings were more persuasive than other findings supporting limitations. The ALJ's impermissible cherry-picking also result in errors of fact and logic in the decision.

Accordingly, it is not clear that the ALJ considered the important evidence in the record or that the ALJ's RFC regarding Ms. T's ability to ambulate is supported by substantial evidence.

### b.  Mental Limitations

The Court also finds that the ALJ erred in his evaluation of Ms. T's mental limitations in the RFC. Ms. T maintains that the ALJ ignored substantial evidence and cherry-picked objective examination findings from both Ms. T's psychological consultative examination with Dr. Victor Rini on October 18, 2018, and well as findings from Ms. T's mental status exam from December 17, 2019. Ms. T also contends that the ALJ failed to explain how he accounted for certain deficits observed by Dr. Rini despite stating that he found the opinion to be "generally persua[sive]." [DE 14 at 30; AR 26].

Here, the ALJ found that Ms. T's statements about the intensity, persistence, and limiting effects of her severe mental impairments were not consistent with the objective medical evidence. Instead, the ALJ found that Ms. T was "generally note[d] as alert, oriented, pleasant, and cooperative, with normal appearance, normal behavior, appropriate mood and affect, and normal insight, judgment, memory, thought content, concentration, and attention." [DE 14 at 30-31; AR 26-27]. Based on this, the ALJ found that Ms. T had an RFC for sedentary work "limited to simple work-related decisions and simple, routine tasks with no assembly line work or strictly enforced daily production quotas" and that she can "occasionally interact with the general public, co-workers, and supervisors." [DE 14 at 25; AR 21].

21

The ALJ discussed objective findings from Dr. Rini and from Ms. T's mental status evaluation in the as part of the ALJ's discussion of Ms. T's RFC for her mental impairments. [*See* DE 14 at 25]. The ALJ cited to Dr. Rini's findings that Ms. T showed no hallucinations, delusions, or bizarre thoughts as well as Dr. Rini's findings about her ability to recall digits and objects after a delay. The ALJ also referenced Dr. Rini's statement that Ms. T's intellectual functioning was normal. From Ms. T's mental status evaluation, the ALJ cited the observation that Ms. T's appearance was normal, she was cooperative with the examiner, her insight and judgment were normal, and she had average intelligence.

However, further review of these citations demonstrates a reliance only on evidence that supports his opinion without support for why contrary evidence in the record was rejected. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (internal citation omitted); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (observing that an "ALJ may not ignore an entire line of evidence that is contrary to [his] ruling"). First, while the ALJ correctly cited to Dr. Rini's finding stating that Ms. T was "functioning in the normal range of intellectual ability," the ALJ fails to acknowledge that Dr. Rini prefaced this statement by noting that "standardized testing was not performed." [DE 14 at 716; AR 712]. And while the ALJ did correctly discuss certain portions of Dr. Rini's findings as to Ms. T's memory, attention, and concentration, the ALJ's decision fails to mention Dr. Rini's other findings in these areas. Specifically, the ALJ fails to mention that Ms. T made two errors in her serial 7s test, that she was unable to recall how she spent Christmas day two years ago or the name of her first-grade teacher, or that Ms. T

did not know from which direction the sun rises, or why light-colored clothing is more comfortable in the summer than dark colored clothing. By failing to mention this evidence, the ALJ provides no explanation as to why the evidence regarding Ms. T's abilities to recall digits and certain objects was more persuasive to his ultimate conclusions leading to her RFC.

As part of the ALJ's summary of the evidence, the ALJ did correctly observe that Dr. Rini opined that Ms. T's attention, concentration, memory, and social functioning abilities were below the average range and that her mental health evaluation noted that her attention, concentration, and memory were impaired. [DE 14 at 27; AR 23]. However, despite mentioning these findings earlier in the decision, the ALJ offers no explanation as to what role these findings played in his conclusion that Ms. T's statements as to her mental impairments were not consistent with the evidence. This is compounded by the ALJ's discussion of the persuasiveness of Dr. Rini's opinion. For claims filed after March 27, 2017, such as Ms. T's claim[7], an ALJ must explain "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b).  Persuasiveness of a medical opinion is based upon several factors: supportability; consistency; relationship with the claimant, including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; and specialization.  20 C.F.R. § 404.1520c(c)(1)-(5).

---

[7] Ms. T filed her claims on July 9, 2018.

The most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion," while "consistency assesses how a medical opinion squares with other evidence in the record." *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (internal citation omitted). "Failure to adequately discuss supportability and consistency requires remand." *Willis v. Acting Comm'r of Soc. Sec.*, No. 3:21-cv-178 JD, 2022 WL 2384031, at *3 (N.D. Ind. July 1, 2022) (citing *Tammy M. v. Saul*, No. 2:20CV285, 2021 WL 2451907, at *7 (N.D. Ind. June 16, 2021)). Consistent with general legal standards for reviewing social security cases, an ALJ need only "minimally articulate his reasoning for how he assessed a medical opinion, [but] he must still consider the regulatory factors and build a 'logical bridge' from the evidence to his conclusion." *Taylor v. Kijakazi*, No. 2:22-cv-32-PPS-JPK, 2023 WL 334601, at *3 (N.D. Ind. Jan. 20, 2023) (internal citation omitted).

Here, the ALJ stated that he found Dr. Rini's medical opinion "generally persua[sive]" and discussed both the supportability and consistency factors as required by the regulations. [DE 14 at 30; AR 26]. As to supportability, the ALJ stated that Dr. Rini's opinion was "supported by his examination." The ALJ rearticulated Dr. Rini's observations that Ms. T was "able to recall 6 digits forwards and 3 digits backwards, she could recall 1/3 items after a 5-minute delay, and she was cooperative during the evaluation." [DE 14 at 30; AR 26]. As to consistency, the ALJ stated that Dr. Rini's opinion was "consistent with the longitudinal evidence which generally note [Ms. T] as

alert, oriented, pleasant, and cooperative, with normal appearance, normal behavior, appropriate mood and affect, and normal insight, judgment, memory, thought content, concentration, and attention." [*Id.*].

However, in stating this, the ALJ does not clarify that Dr. Rini actually opined that Ms. T's attention, concentration, memory, and social functioning were below average. As a result, the ALJ fails to explain his reasoning that Dr. Rini's opinion—which stated that Ms. T had below average attention, concentration, memory, and social functioning—is consistent with the other "normal" evidence cited. The ALJ's string citation to this "normal" evidence at the end of his conclusion also fails to illuminate the ALJ's reasoning, especially regarding Ms. T's attention, concentration, and memory. Here, the ALJ did correctly cite evidence noting that Ms. T was observed as pleasant, alert, oriented, and cooperative. [*See* Exhibit 2F at 9, 45, and 98-99; Exhibit 8F at 4, 15, 21, Exhibit 10F at 2 and 12, and Exhibit 11F at 2, 64]. Further, the second set of records cited by the ALJ states that Ms. T's judgement and thought content was observed as normal. [*See* Exhibit 8F at 4, 15; Exhibit 11F at 2, 64]. However, the only record cited by the ALJ that discusses Ms. T's memory, concentration, and attention is her mental health evaluation from December 17, 2019. [Exhibit 13F]. This record includes contradictory information that is not addressed by the ALJ. Indeed, the first portion of the evaluation cited by the ALJ states that Ms. T shows "[i]mpairment of Attention/concentration Short term Long term Memory." [Exhibit 13F/4; DE 14 at 1063; AR 1059]. However, the second portion cited by the ALJ refers to the interpretative summary at the end of the

evaluation, which states "attention/concentration WNL[8]" and "memory WNL."
[Exhibit 13F/9; DE 14 at 1068; AR 1064]. The ALJ fails to mention this discrepancy in the
record. As a result, the decision provides no explanation why the ALJ purportedly
relied on only this second finding.

Based on this, the Court cannot find that the ALJ evaluated Dr. Rini's opinion
fairly and accurately. First, the ALJ discussed only certain portions of Dr. Rini's
examination findings and failed to address other findings. Next, the ALJ failed to
directly acknowledge that Dr. Rini opined that certain of Ms. T's mental functions were
below the average range when discussing its persuasiveness and failed to address
conflicts in the evidence cited as consistent with Dr. Rini's opinion. Accordingly, as the
decision lacks an accurate and logical bridge about the persuasiveness of Dr. Rini's
opinion as well as an adequate discussion of the supportability and consistency factors
for this opinion, the Court must remand.

The Commissioner also contends that the ALJ supported the RFC with
substantial evidence because the ALJ was persuaded by opinions from the state agency
consultants. The state agency consultants reviewed Ms. T's records on October 23, 2018,
and on May 6, 2019. Ms. T contends that significant records were submitted after these
opinions were rendered such that the records were "stale." Specifically, Ms. T contends
that x-rays after these dates showed that Ms. T had a fractured pin, calcaneal osteotomy,
and tibiotalar joint osteoarthritis. [DE 26 at 9, citing DE 14 at 1039, AR 1035]. Ms. T also

---

[8] Although the ALJ does not address or otherwise define "WNL" in the decision, the Court assumes that
this means "within normal limits."

contends that physical examinations from May 2019 to December 2019 showed continued limitations, and that Ms. T participated in another round of physical therapy after the state agency consultants' review.

The Court declines to determine whether this additional information rendered the state agency consultants' opinions stale. However, considering the amount of records submitted after the consultants' review, the Court cannot find that the ALJ sufficiently explained the persuasiveness of these opinions. Here, the ALJ stated that he was persuaded by these opinions and found them to be "supported by a detailed review of the record and citation to the record" but fails to acknowledge that these opinions were issued before several months of additional evidence was submitted in the record. [DE 14 at 30; AR 26]. Without more, the Court cannot find that the ALJ built an accurate and logical bridge between his conclusion regarding the supportability of these opinions.

Next, the Commissioner contends that the Court should affirm the ALJ's decision because there was no medical opinion in the record that found any greater limitation than those articulated by the ALJ. However, the Court cannot agree. First, reconsideration of the supportability and consistency factors for Dr. Rini's opinion may lead to a reassessment of Ms. T's mental limitations in her RFC. Second, the ALJ explained that he found Ms. T capable of a range of sedentary work based on his conclusion that Ms. T was "generally" found to have normal range of motion, strength, and mental capabilities. However, in forming this conclusion, the ALJ ignored evidence demonstrating abnormalities or limitations and failed to confront evidence of

abnormalities summarized in the decision. Without such any analysis resolving this dissonant evidence, the Court is left to "speculate as to the basis for the RFC limitations" which it cannot do through its limited review. *See Moore*, 743 F.3d at 1128.

Finally, as noted earlier in this opinion, Ms. T has raised other challenges to the ALJ's Listing Analysis at Step Three. However, since the Court is remanding based on errors in discussing Ms. T's RFC, the Court need not discuss those other arguments at this time. The ALJ will have the opportunity to fully discuss and reevaluate the rest of Ms. T's allegations on remand.

## IV.   CONCLUSION

Based on the foregoing, the decision of the ALJ is **REVERSED** and the instant action **REMANDED** for further administrative proceedings consistent with this opinion.

**SO ORDERED** this 30th day of March 2023.

s/ Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge

28